**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

ESTATE OF ANTONIO GONZALES, et al.,

        Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.

Case No: 21-cv-0848

---

ESTATE OF JAY ANDERSON, JR., et al.,

        Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.

Case No: 21-cv-1179

---

ESTATE OF ALVIN COLE, et al.,

        Plaintiffs,

    v.

JOSEPH ANTHONY MENSAH, et al.,

        Defendants.

Case No: 22-cv-0856

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. 78)
AS TO THE ESTATE OF JAY ANDERSON, Jr. (21-CV-1179)**

---

NOW COMES Plaintiffs, by their attorneys, and for their brief in opposition to Defendants' Joseph Anthony Mensah, Barry Weber, and City of Wauwatosa (collectively, "Defendants", unless otherwise noted) Motion for Summary Judgment (Dkt. #78) in the Jay Anderson, Jr. matter, Case #21-cv-1179, alleges and shows the Court as follows.

## SUMMARY OF ARGUMENT

This is an excessive deadly force case. Defendants argue that Joseph Mensah shot Jay Anderson purportedly because Anderson had a weapon near him on the front seat of his car and Mensah believed that Anderson was trying to reach for it during their interaction. However, Plaintiffs dispute Defendant's version of events, for the reasons noted below. And, importantly, there is a disputed issue of fact as Mensah now admits that Anderson could have been reaching for his mobile phone that also was on the front seat with the vehicle, as opposed to the legally possessed weapon:

Attorney Cade:     "So it's fair to say that today you can't state definitively that Mr. Anderson was reaching for a gun as opposed to for his phone, fair?"

Mensah Answer:     "Fair."     (PFOF ¶ 24)



Plaintiffs also dispute Defendants' assertion that Mensah is entitled to qualified immunity for using excessive deadly force. Finally, Plaintiffs dispute that Defendants are entitled to summary judgment on the remaining claims asserted in the Amended Complaint because Defendants failed to answer the Amended Complaint after this Court's ruling on Defendants' motion to dismiss. The failure to answer constitutes an admission of the allegations contained in the Amended Complaint. [1]

## **STATEMENT OF FACTS[2]**

Jay Anderson, Jr. committed no crime and never posed an immediate danger to Officer Mensah's life on June 23, 2016, before being shot and killed. PFOF ¶¶ 1-3, 39. It is not a crime to be in the park after hours and it is not a crime to carry an unloaded firearm in your vehicle. PFOF ¶¶ 15-17, 40. Yet, Mensah claims that Anderson's eye movements, body language, and alleged "lunging" toward the front passenger seat was enough to justify deadly force. DPFF ¶ 44. However, even Mensah cannot refute other possibilities such as Anderson reaching for his cell phone, car registration, or other items located in the passenger area. PFOF ¶¶ 23-24, 54. An objective viewing of the squad footage from June 23, 2016 does not show Anderson making threatening movements. Rather, the footage shows Anderson complying with commands, communicating with Mensah, and attempting to indicate his movements ahead of time. The disputed issues of material fact in this case are clear: Anderson could have been reaching for a cell phone or registration, he never displayed erratic, violent behavior, and committed no crime.

---

[1] As noted below, there are three consolidated cases (21-CV-848, 21-CV-1179, 22-CV-856). For purposes of this Response, when citing to the docket, Plaintiffs will distinguish between the Gonzales, Anderson and Cole cases, where necessary.

[2] Plaintiffs have filed a response to the Defendants' proposed findings of fact ("DPFF"), ECF 79, as required by this Court, as well as their own proposed findings of fact ("PFOF").

Anderson was legally parked in Madison Park on June 23, 2016, when he was awoken, shot, and killed by Officer Mensah. PFOF ¶¶ 1-3. Anderson was asleep for several hours after leaving a bar early that morning. PFOF ¶ 3. Mensah approached the park around 3:00 AM and observed Anderson's car in the parking lot. PFOF ¶¶ 3-5. Mensah dispatched that there was an occupied auto and dispatch informed Mensah that the vehicle was not stolen but was registered to Olena Delarosa. PFOF ¶¶ 4-5. Furthermore, there is no evidence that Madison Park closed at 10 PM as Defendants suggest. PFOF ¶ 40; DPFF ¶ 12. Many of Anderson's family members would frequent Madison Park before and even after Anderson's death never observed closing hours. PFOF ¶ 40, 91, 92. Being at the park "after hours" equates to nothing more than a municipal ticket. PFOF ¶ 40, DPFF ¶ 12.

Mensah voluntarily engaged with the auto and knocked on the passenger window. PFOF ¶ 8. Anderson woke up, turned the ignition on, and rolled down the passenger side window. PFOF ¶¶ 8-9. Mensah commanded Anderson to put his hands in the air and Anderson complied. PFOF ¶¶ 8, 14. Mensah purportedly asks Anderson for his identification but claims that Anderson stated he did not have any. PFOF ¶¶ 10. Curiously though, Anderson's identification was found in his pocket after he was shot. PFOF ¶¶ 10. Only after the window was rolled down did Mensah visualize Anderson's gun in the front passenger seat. PFOF ¶¶ 11. Mensah then orally identified the weapon and purportedly commanded Anderson not to touch it. DPFF ¶ 42. Throughout the entire encounter, Anderson does not touch the weapon. DPFF ¶ 42. Additionally, per Wisconsin's open carry laws, Anderson was in legal possession of an unloaded firearm as he did not commit a crime nor was he a felon. PFOF ¶¶ 15-16, DPFF ¶¶ 87-88.

4

Mensah contends that Anderson made four separate movements toward the gun on the passenger seat. DPFF ¶ 40. Furthermore, Mensah states that Anderson "lunges" at the loaded gun. DPFF ¶ 44. However, the squad footage does not showcase any lunges or sudden changes in body posture. In fact, the squad video shows quite clearly that Anderson's hands are raised—dipping only slightly—and appears to be conversing with Mensah and motioning as if asking for permission. PFOF ¶ 20. And importantly, the record does not contain a single piece of evidence to suggest that Anderson's weapon was loaded. DPFF ¶ 100. Subsequent photos were taken of both weapons and, curiously, Mensah's bullets are counted and displayed while Anderson's weapon shows not a single bullet. DPFF ¶¶ 97, 100.

At 03:07:15 AM, Mensah discharges his weapon six times striking and killing Anderson. PFOF ¶ 21. Unfortunately, the squad video footage does not capture the entire event because Mensah failed to approach the scene with his squad emergency lights engaged and failed to activate his squad car lights remotely from a device he had attached to his lapel. PFOF ¶ 22, 25. Because Mensah made verbal commands and effectuated a traffic stop, Mensah was required by policy to record the full interaction but chose not to. PFOF ¶¶ 74-76. After shots were fired, Mensah eventually hits his lapel mic to capture approximately 30 seconds of film prior to the shooting. PFOF ¶ 25. After a full 25-30 seconds, or around 03:07:45 AM, Mensah alerts dispatch that shots were fired and that the suspect was down. PFOF ¶ 21.

Dispatch had already sent additional squads to the scene upon Mensah radioing that he observed a gun, but none arrive before the shooting. DPFF ¶ 21. Officers Salyers and Mills arrive to secure the scene. DPFF ¶ 22. Salyers orders Mills to grab the gun from the passenger seat but neither of them can be certain of its positioning. PFOF ¶¶ 44-47.

5

Salyers alerts dispatch that Anderson was not breathing. PFOF ¶¶ 95. Salyers and Mills then remove Anderson from the vehicle where Salyers eventually locates identification in one of Anderson's pockets. PFOF ¶ 45. Not one officer can recall the gun's location or position before it was removed—nor is there a single photograph of Anderson's body or the gun on scene—and only Mensah has personal knowledge of the conversations leading up to the death of Anderson. PFOF ¶¶ 34, 36, 47, 49, 51, 53, 56.

## THE APPLICABLE SUMMARY JUDGMENT STANDARD.

Summary judgment is required ***only*** where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)(emphasis added). When considering a motion for summary judgment, the Court is to take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 255, 106 S.CT. 2505 (1986); *Schuetta v. Aurora Nat'l Life Assurance Co.*, 27 F.Supp.3d 949, 955-56 (E.D. Wis. 2014), citing Fed.R.Civ.P. 56(a).

And, importantly, this requirement even applies when an officer invokes qualified immunity as a defense. *Taylor v. City of Milford*, 10 F.4th 800, 808 (7th Cir. 2021)(noting that summary judgment on the question of qualified immunity is inappropriate where "determining whether [defendant's] violation of [plaintiff's] rights was clearly established [as unlawful]... requires findings of fact."); *Tolan v. Cotton*, 560 U.S. 650, 656, 134 S. Ct. 1861, 188 L.Ed.2d 895 (2014)("But under either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."), citing *Brosseau v. Haugen*, 543 U.S. 194, 195 n. 2 (2004).

For purposes of this motion, the Court cannot weigh the evidence or decide which testimony is more credible. *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir.

2010). When ruling on a motion for summary judgment, "*a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts*; these are jobs for a factfinder." *Id.* (emphasis added). *See also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)(Credibility determinations and weighing of the evidence ". . . are jobs for a factfinder.").

Finally, in the Seventh Circuit, summary judgment is to be used sparingly in excessive force cases where, as here, the parties' versions of the facts differ sharply. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005)(holding that "since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'")(quotations omitted); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 n. 4 (7th Cir. 2012) (". . . summary judgment is frequently inappropriate in excessive force cases."); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (The "*reason* that summary judgment is often inappropriate in excessive force cases is that the parties typically tell different stories about what happened").

Summary judgment in this Circuit is especially rare, and a request for such disposition evaluated critically, where the victim of such force is dead. *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)("The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify. In any self-defense case, a defendant knows that the only person likely to contradict him or her is beyond reach. So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could

7

reasonably be rejected at a trial."); *Cyrus v. Town of Mukowonago,* 624 F.3d 856, 862 (7th Cir. 2010)(reversing a grant of summary judgment where the court "recognized that summary judgment is often inappropriate in excessive- force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations. This principle is particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify.")(citations omitted); *Abdullahi* 423 F.3d at 772 n.7 ("'The award of summary judgment to the defense in deadly force cases may be made only with particular care *where the officer defendant is the only witness left alive to testify.*'")(emphasis added)(citations omitted).

Finally, it is important to appreciate that "inferences are often necessary when the plaintiff's sole eyewitness is dead," and keep in mind that a plaintiff may always prove her case "by circumstantial evidence where direct evidence is unavailable." *Abdullahi* 423 F.3d at 772, citing *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003) ("Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable.").

Accordingly, for present purposes the truth of Plaintiffs' well-supported material facts must be assumed. Then, the Court asks whether—on *those* facts—any of the Defendants are entitled to judgment as a matter of law. *Weinmann v. McClone,* 787 F.3d 444, 449 (7th Cir. 2015) ("Our task is to determine, under [Plaintiff's] version of the facts, if [the Defendant Officer] was objectively reasonable in his belief that his life was in danger."); *Payne*, 337 F.3d at 778 (the court must assume non-movant's facts in assessing summary judgment motion).

Properly construed under FED. R. CIV. P. 56(a) and *Anderson*, 477 U.S. at 248, the current record unambiguously supports each of Plaintiffs' claims. This Court should deny Defendants' motion for summary judgment because genuine issues of material fact exist. This Court cannot resolve the disputed facts, and thus, a jury trial is necessary.

## Defendants' Failed to Respond or Answer Plaintiffs' Amended Complaint

Before delving into the substance of the argument, it is important to note a procedural issue caused solely by the failure of the Defendants. Specifically, Defendants failed to file an answer or otherwise plead to the Amended Complaint in the Anderson case, 21-cv-1179 (Anderson ECF 47), and thus, pursuant to FRCP 8(b)(6), those allegations are deemed admitted.[3] Procedurally, Plaintiffs filed the initial Complaint on October 13, 2021. Anderson ECF 1. Defendants then filed their answer. Anderson ECF 14. Subsequently, Defendants filed a Motion to Stay Discovery in Anderson because of the potential criminal charges against Defendant Mensah. Anderson ECF 27. Judge Ludwig granted the Motion to Stay on April 5, 2022. Anderson ECF 34. Plaintiffs filed a motion to consolidate all three cases pertaining to Joseph Mensah on August 8, 2022. ECF 42. The Court granted the motion on September 22, 2022. Gonzales ECF 52.

Plaintiffs subsequently filed their Amended Complaint in Anderson on August 24, 2022. Anderson ECF 47. Defendants filed a motion to dismiss most, **but not all,** of the claims contained in the Amended Complaint on September 7, 2022. Anderson ECF 50.[4]

---

[3] Plaintiffs are not requesting a default judgment, pursuant to FRCP 55, nor are Plaintiffs moving to strike Defendants' motion for summary judgment, as such motions are disfavored by the Court. Civil L.R. 56(b)(10). Instead, the failure to answer the specific factual allegations contained in the Amended Complaint are deemed admitted, FRCP 8(b)(6), and should be the basis for this Court's denial of Defendants' motion for summary judgment.

[4] Defendants also filed a motion to dismiss the Amended Complaint in the Alvin Cole case, 22-cv-0856. *See* Gonzalez ECF 82-85.

More specifically, Defendants moved to dismiss Defendant Barry Weber from Claim 1 and Defendants from Claims 2 through 9 in their entirety (Paragraphs 146-255) of the Anderson Amended Complaint. *Id.* Defendants **did not** move to dismiss nor did they provide an answer to Claim 1 for Relief of Excessive Force against Defendants Mensah and the City of Wauwatosa (Paragraphs 146-172) of the Anderson Amended Complaint. The Court issued a combined decision on the Motion to Dismiss in Anderson and Cole on April 11, 2023. Gonzales ECF 56. Although required by federal rules to do so, Defendants failed to file an answer or otherwise plead 14 days after the Court's ruling, or by April 25, 2023.[5] Cade Decl., ¶ 19.

Thus, Defendants have admitted the allegations contained in Paragraphs 1-255 of the Amended Complaint (Anderson ECF 47). *See* FRCP 8(b)(6)("**Effect of Failing to Deny.** An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied. . . ."); *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013)("Indeed, Modrowski might have ***conclusively established*** most of the material facts alleged in his complaint simply by highlighting the defendants' failure to file a timely answer to his first amended complaint. . . The defendants' unorthodox strategy of responding to Modrowski's first amended complaint with a motion for summary judgment, unaccompanied by any other responsive pleading, was thus risky, because Modrowski could have pointed to "admissions on file" to support his allegations."), citing *Celotex*, 477 U.S. at 324; *Barwin v. Village of Oak Park*, 15-cv-6046, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)("There is a distinction between

---

[5] *See* FRCP 12(a)(4)(" if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action"); *Becker v. Fitzgerald*, No. 94 C 7646, 1995 WL 215143, *2 (N.D. Ill. April 10, 1995).

relying on the *allegations* in the complaint (which is insufficient to survive an opponent's motion for summary judgment) and relying on the defendant's *admission* of those allegations. Barwin has done the latter."(italics in original)), *aff'd in part, rev'd in part and remanded*, 54 F.4th 443 (7th Cir. 2022), citing *Modrowski. See also Gopon-Rosel v. Plastics Engineering Co.*, 2009 WL 142354, *6 n.7 (E.D. Wis. Jan. 20, 2009)(Adelman, J.); *Dunbar v. Prelesnik*, 16-1374, 2016 WL 11618615, *2 (6th Cir. Oct. 27, 2016)("After the district court denied their motions to dismiss, the defendants filed a motion for summary judgment. While filing a motion to dismiss tolls the deadline for a defendant to file an answer to a complaint by operation of Rule 12(a)(4)(A), Rule 56 has no similar provision for summary judgment motions. Accordingly, when the district court denied the defendants' motion to dismiss, the defendants were required to file an answer within fourteen days. *See* Fed. R. Civ. P. 12(a)(4)(A). The defendants' failure to do so constituted an admission of all of the complaint's factual allegations pursuant to Rule 8(b)(6)."), citing *Modrowski.*

Because of the failure of Defendants to admit, deny or otherwise respond, as required by FRCP 8(b)(6), the allegations contained in the Amended Complaint, Anderson ECF 47 Paragraphs 1-255, are deemed admitted and this Court should deny Defendants' motion for summary judgment, and allow this matter to proceed to trial.

## ARGUMENT

### I. THE INDIVIDUAL CAPACITY CLAIMS AGAINST WEBER FOR SUPERVISOR LIABILITY SHOULD SURVIVE THE MOTION FOR SUMMARY JUDGMENT.

This Court should deny Defendants' motion for summary judgment as to the individual capacity claims against Chief Barry Weber. There is no dispute that Defendant Weber was the police Chief and final policymaker at all times relevant for the Wauwatosa

Police Department. DPFF #5; Anderson ECF 47, ¶ 175. As previously noted, Defendants did not file their answer to the Amended Complaint, Anderson ECF 47, as required, Fed. R. Civ. P. 12(a)(4)(A), after the Court issued its ruling on the motion to dismiss. Gonzales 21-cv-0848 ECF 54. The failure to file, for purposes of summary judgment, is an admission that the allegations in the Amended Complaint are deemed admitted. Therefore, for purposes of summary judgment, Defendants have admitted the allegations in the Amended Complaint with regards to the individual capacity claims against Weber for supervisory liability and summary judgment should be denied. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170, *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021); *Dunbar*, 2016 WL 11618615, *2 (6th Cir. Oct. 27, 2016).

In addition, Defendant Weber, as the final policy maker for the WPD should be liable as he was personally involved in the deprivation of violating Anderson's constitutional rights. *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). "To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it or turn a blind eye for fear of what they might see." *Id. (quoting Jones v City of Chicago, 856 F. 2d 985, 992-93* (7th Cir. 1988). Negligence of a supervisor is insufficient to establish personal involvement; the supervisor must "act either knowingly or with deliberate, reckless indifference." *Jones*, 856 F. 2d at 992. Whether Mensah violated use of force policies or used excessive force when he shot and killed Antonio Gonzales, those questions would have been solely investigated by the Wauwatosa Police Department'. PFOF ¶ 67.

Defendants, therefore, have admitted the following facts with regards to individual capacity claims against Weber: (1) Weber failed to conduct an internal investigation or conduct a fitness for duty evaluation of Mensah after the Antonio Gonzales shooting

eleven months prior. Anderson ECF 47, ¶¶ 63, 65, 239; (2) In fact, WPD never conducted

a fitness for duty evaluation of any officer-involved shooting from July 16, 2015 to

February 2, 2020. Anderson ECF 47, ¶ 64; (3) Despite the investigation of Mensah by the

Milwaukee County District Attorney, Weber decided to award Mensah with a Medal of

Valor, ratifying Mensah's conduct for killing Antonio Gonzales. Anderson ECF 47, ¶ 63,

65, 68, 70, 135, 219, 226, 230; (4) Wauwatosa failed to create and implement appropriate

and adequate use of force policies. Anderson ECF 47, ¶ 167; and (5) Weber was aware

of Wauwatosa's defective customs, policies and procedures before Mensah shot and

killed Anderson. Anderson ECF 47, ¶ 165.

These admissions should be enough to survive summary judgment, as Weber

turned a blind eye to what was right in front of him. *Matthews*, 675 F.3d at 708.

## II. MENSAH USED EXCESSIVE FORCE WHEN HE SHOT AND KILLED JAY ANDERSON FOR BEING IN HIS CAR IN MADISON PARK, THEREBY VIOLATING ANDERSON'S FOURTH AMENDMENT RIGHTS.[6]

Mensah shot at Anderson six times while he stood on the passenger side of

Anderson's car. There is no dispute that shooting someone is a use of force and a seizure

under the U.S. Constitution, and there is no dispute that the force used by Mensah was

---

[6] While this section addresses the Claim of excessive force against Mensah, Plaintiffs note that the excessive force claim against the City must survive summary judgment as Defendant's failed to respond to Plaintiffs Amended Complaint and such allegations of excessive force against the City are deemed admitted. ECF 20 ¶ 134-145, 159-176. Additionally, Plaintiffs have alleged that the City was on notice to numerous excessive force issues and the undisciplined over policing by WPD officers particularly against people of color under the authority of its chief policymaker, Weber. PFOF ¶ 85 Weber further caused the shooting of Anderson by clearing Mensah without conducting a fitness for duty evaluation or even a fitness for duty policy, ratifying Mensah's use of excessive force by awarding him with a medal of valor for killing Antonio Gonzales and allowing Mensah back to work without conducting an internal investigation for the Gonzales shooting. *Id*; PFOF ¶ 70, 85, 86, 88. Plaintiffs further allege that these constitutional violations were brought on by the City's defacto custom or practices of excessive force particularly against people of color under Weber's authority which resulted in the shootings of Gonzales Anderson, and (Cole). PFOF ¶ 65; ECF 20 ¶¶ 33, 38. 134-172,

deadly as to Anderson. Thus, the issue is whether Mensah's use of force was excessive. The answer is yes, and it should serve as the basis to deny Defendants' motion.

Police officers may use force, up to and including deadly force, under the appropriate circumstances. "But it is also the case that the Constitution forbids the use of excessive force." *Weinmann*, 787 F.3d at 447. The determinative issue is whether such use of force "has crossed the constitutional line" under the Fourth Amendment and whether the force used was reasonable (i.e. whether the force used is excessive). *Id.*; *Estate of Sylville K. Smith v. City of Milwaukee*, 410 F. Supp. 3d 1066, 1071 and n.4 (E.D. Wis. 2019)(Adelman, J.). In order to make such a determination as to the amount of force used, "The law requires an assessment of the totality of the facts and circumstances, which includes consideration of 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Estate of Smith*, 410 F. Supp. 3d at 1071, quoting *Strand v. Minchuk*, 910 F.3d 909, 914-15 (7th Cir. 2018), *cert. denied,* __ U.S. __, 139 S. Ct. 1629, 203 L.Ed.2d 900 (2019); *Muhammed v. City of Chicago*, 316 F. 680, 683 (7th Cir. 2002)("Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape.") quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105. S.Ct. 1694, 85 L.Ed.2d (1985). Thus, "[a]s applied to the present case, this means that [Jay Anderson] has a constitutional right to not be shot on sight if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime." *Weinmann*, 787 F.3d at 447. The discussion of each of the three potential factors for the Court to consider as to amount of force used demonstrates that Mensah did not

have an excuse or justification to use any force, let alone deadly force, as to Anderson, and thus, the force applied was excessive.

However, before considering the facts, this Court first should deny the motion for summary judgment as to the excessive force claims against Joseph Mensah and the City of Wauwatosa *procedurally* because Defendants failed to provide an answer. First, as previously noted, Defendants did not file their answer to the Amended Complaint, as required, by Fed. R. Civ. P. 12(a)(4)(A), so, they have admitted the allegations of the Amended Complaint. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170 *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021). Second, Defendants never answered Plaintiffs Amended Complaint in Claim One as it relates to Mensah and the City of Wauwatosa. Anderson ECF 47, ¶146-172. Finally, Defendants *never* argued to dismiss Claim One (the excessive force allegation) against Mensah or the City of Wauwatosa in their Amended Motion to Dismiss. ECF 51.

With regards to the facts and excessive force factors the Court is to consider:

**A.** **Severity of the Crime**: Here, there is no allegation or argument as to the severity of the crime at issue. Anderson was in a public park, purportedly after hours, sleeping when he was awoken by Mensah. There were no signs in the park noting the hours of operation. Declaration of Jay Anderson, Sr., at ¶¶ 4, 6-9. At best, the "crime" for being in the park after hours was a noncriminal municipal citation. PFOF ¶ 40. Certainly the alleged noncriminal actions of Anderson being in a public park in the early morning hours itself does not permit a finding that justified Mensah's use of deadly force. *Cf. Pekrun v. Puente*, 172 F. Supp. 3d 1038, 1045 (E.D. Wis. 2016)(Adelman, J.)(suspect had only committed an ordinance violation), citing *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 732 (7th Cir. 2013)(police cannot use "significant force" on non-resisting or

passively resisting suspects) and *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003)(use of less than lethal force objectively unreasonable where suspect, among other things, was charged with a minor offense); *Gonzales-Guerrero v. City of San Jose*, No. CV12-03541 PSG, 2013 WL 3303144, at *3 (N.D. Cal. June 28, 2013)("But Defendants can point to no case authorizing the use of deadly force against a man who is simply sleeping with a gun at his waistband, without proof of any criminal activity or other danger. Mere possession of a firearm, without more, cannot justify shooting to kill.").

**B. Actively resisting arrest or attempting to evade**: The only living "witness" [7] to the shooting, Mensah, admitted in his deposition that: (1) Anderson was asleep when he found Anderson's car in the park, (2) Mensah woke him up, (3) Mensah instructed Anderson to turn on the ignition so that Anderson could roll down the passenger window, (4) Mensah commanded Anderson to put his hands up, and (5) Mensah asked Anderson a questions. PFOF ¶ 3, 8, 10, 11. Mensah does not suggest that Anderson was actively resisting arrest (because Mensah never put Anderson under arrest)[8] nor does Mensah allege that Anderson was attempting to evade arrest by flight (as the video demonstrates that Anderson never attempted to place the vehicle in drive or run from Mensah). In fact, a review of the less than 30 seconds of available video of the interaction between the men demonstrates that a detained Anderson had his hands up except for a few different

---

[7] There is a 5 minute and 38 second video from Mensah's squad dashcam, which the Court can take judicial notice of. *See* Cade Decl., ¶ 20. As noted, the video shows very little of the interaction between Anderson and Mensah before the shooting, as Mensah failed to initiate the squad cam when he pulled up to Anderson's vehicle, and Mensah only initiated the recording *after* he had fired his weapon into Anderson. Mensah's credibility, for purposes of summary judgment, is suspect where he killed the only other witness. *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020)("Summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations," particularly where "the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify.").

[8] Mensah does correctly note that Anderson was "detained" in that he was not free to leave the park on his own volition. PFOF ¶ 93, DPFF ¶ 98.

moments where Anderson's right-hand dips and then quickly goes back up. PFOF ¶ 8, 74, 93. The purported movement of Anderson's right hand will be discussed below. But, for purposes of this factor, it is readily apparent that Anderson did not attempt to resist or evade.

**C.** **Poses an Immediate threat to the safety of an officer**: The third factor, whether Anderson posed an immediate threat to the safety of Mensah or others, is the only factor left that is available for Mensah to argue with regards to his use of force. Given the facts of this case, it is the only theory that Mensah can advance. Here, Defendants claim that Mensah shot Anderson because Mensah believed that Anderson was reaching for the weapon that was on the front seat of the car. All else being equal, that certainly would seem to fit the rubric of the ability to use deadly force. However, there is a factual dispute as to what Anderson was doing with his hands (i.e. reaching for a gun, for a mobile phone, or trying to open the glovebox to get the vehicle's registration, or just maybe, Anderson was just tired and intoxicated which caused his hands to dip down), and the Court is not permitted to credit Mensah's belief, but what an objectively reasonable officer in a similar position would or would not know. PFOF ¶ 24, 98; ECF 47 ¶ 106.

Here, what a reasonable officer would know is that: (1) Anderson was asleep in the park when the officer came upon Anderson's car in the park; (2) Being in the park after hours, at most, is a municipal violation, not a crime;[9] (3) No one complained about Anderson being in the park; (4) The officer woke up Anderson from his sleep; (5) There was an unloaded gun on the front passenger seat of the car, which in Wisconsin is

---

[9] *See* Wis. Stat. §939.12 (Conduct punishable only by forfeiture is not a crime).

permissible and legal, absent additional information;[10] (6)The car was not reported stolen;

(7) The car, at the time the officer arrived, was not running to suggest a crime was being

committed or the occupant [Anderson] was attempting to flee; (8) There was a mobile

phone on the front passenger seat; (9) Individuals often use mobile phones to record their

interactions with law enforcement officers; (10) The recording of an interaction between

a citizen and a law enforcement officer is not illegal; (11) The registration for the vehicle

was in the glovebox; (12) Anderson had his hands up and appeared to be complying with

the officer's instructions; and finally, (13) "as of Nov. 8, 2008, it was clearly established

that an officer may not use deadly force against a person who is suspected only of minor

offenses and who does not pose a danger to the community." *Pekrun*, 172 F. Supp, 3d at

1050, citing *Garner*, 471 U.S. at 11 and *Ellis*, 999 F.2d at 247.  PFOF ¶¶ 3, 5, 8, 23, 24,

90.  Because there is a dispute as to what a reasonable jury might see when viewing the

dash cam video, summary judgment is inappropriate.

### III.  MENSAH IS NOT ENTITLED TO QUALIFIED IMMUNITY.

It appears frivolous for Defendants to have raised the qualified immunity argument

on behalf of Mensah. Qualified immunity "protects government officials from liability for

civil damages insofar as their conduct does not violate *clearly established* statutory or

constitutional rights of which a reasonable person would have known." *Pearson v.*

*Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.d.2d 565 (2009)(emphasis added).

Qualified immunity operates "to ensure that before they are subjected to suit, officers are

on notice their conduct is unlawful." *Pekrun*, 172 F. Supp. 3d at 1048 (citations omitted).

---

[10] *See* DPPF ¶ 100 (inventory of gun). The additional issues would such as whether Anderson is a felon, which would mean he could not possess the weapon. But Anderson was not a felon. And importantly, although Mensah claims that Anderson told him he did not have identification, which he actually had, there is no evidence that Mensah called into dispatch to verify Anderson's name or see if there were any warrants.

Once the defense of qualified immunity is raised, a plaintiff "must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (explaining that "qualified immunity shields from liability [defendants] who act in ways they reasonably believe to be lawful"); *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); *Weinmann*, 787 F.3d at 447.

While the Supreme Court's case law "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (internal citations omitted). "In other words, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**A. Do the Facts Show the Violation of a Constitutional Right.**

Under the Supreme Court precedent, the first prong of inquiry for this Court is to determine whether Mensah used excessive deadly force, and thus violated Anderson's Fourth Amendment constitutional rights, pursuant to *Tennessee v. Garner*, 471 U.S.1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and their related progeny. *See Strand*, 910 F.3d at 914-15. There is little doubt that shooting and killing a citizen is a use of force and subject to the reasonableness requirement of the Fourth Amendment. *California v. Hodari,* 499 U.S. 621, 625-26, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Garner*, 471 U.S. at 9 ("Use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable . . . Where the suspect poses no immediate threat to the

officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). As noted in Section II, *supra.*, Mensah used excessive deadly force when he killed Anderson, and such use was not reasonable.

**B. Whether the right was "clearly established" at the time of the alleged violation.**

The question here is whether it was clearly established that an officer is not permitted to shoot a person in a parked car who has a legal right to possess the weapon and has not exhibited dangerous behavior.[11] The answer is yes, it was clearly established. *See Agnew v. Cater*, No. 3:18-CV-50035, 2022 WL 540763, at *1 (N.D. Ill. Feb. 23, 2022), where the court specifically noted that such a right was established by at least 2013:

> **"[I]t was clearly established as of 2013** that an officer confronted with a stationary vehicle and a driver who had not exhibited dangerous behavior would not be entitled to use deadly force." *Rand v. Lavoie*, Case No. 14-cv-570, 2017 WL 3891679, at *4 n.3, 2017 U.S. Dist. LEXIS 142755, at *12 n.3 (D.N.H. Sept. 5, 2017) (citing decisions from four different Circuit Courts dating back to 2007) . . . Albeit an out-of-circuit decision, the 2005 opinion in *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), is instructive. In that case, the Sixth Circuit found that as far back as 2002, it was clearly established that a law enforcement officer could not use deadly force by shooting at a non-violent motorist when pedestrians were not in harm's way of the vehicle, despite the rapidly developing events confronting the officer. *Smith*, 430 F.3d at 775-76. And if a law enforcement officer cannot shoot at a moving vehicle that was not in danger of striking an officer and bystander, then an officer **certainly cannot shoot** a motorist in a stationary vehicle."

2022 WL 540763, at *11 (emphasis added).

Here, Anderson was in a stationary vehicle with the ignition on, but only because Mensah had instructed him to roll down the car's passenger window. PFOF ¶ 8.  Anderson

---

[11] The Court, and Defendants, are reminded that Plaintiffs' version of the facts as to whether Anderson purportedly was exhibiting dangerous behavior, which Plaintiffs deny, is the version to be credited on summary judgment. *Simpson,* 171 F.3d at 551; *Bombard,* 92 F.3d at 562. And the non-moving party's version of facts is credited even when the Court is considering summary judgment as to qualified immunity. *Taylor*, 10 F.4th at 808; *Tolan,* 560 U.S. at 656.

also had a mobile phone on the front seat. PFOF ¶¶ 13, 24. Although Anderson was not the owner of the vehicle, he had permission to use it. PFOF ¶ 5. The car's registration was in the glovebox. PFOF ¶ 90. Finally, Anderson had an unloaded weapon on the front seat, which while it is publicly displayed and out in the open, he was allowed to possess under state law and for which Mensah (and the other Wauwatosa officers) admit that he could do so. PFOF ¶¶ 15, 16.

From the perspective of the video at 3:06:55 a.m. Anderson has his hands up.



A short review of the 30 seconds of relevant video demonstrates that Anderson's right hand dips twice before Mensah shot him. So, what, if anything, was Anderson doing with his hands? Defendants claim that Anderson was reaching—even lunging—for the unloaded weapon. But, at his deposition, Mensah admits that Anderson likely was reaching for his mobile phone to record the interaction with Mensah. PFOF ¶ 24. That is a disputed issue, especially with Anderson dead.

Another possibility as a disputed issue is that an intoxicated and tired Anderson at 3:06 a.m. awoken by Mensah could have been physically unable to hold his hands in the air for the nearly four minutes that Mensah expected him to do so. PFOF ¶ 98.

And a **fourth option also is plausible** – Anderson could have been reaching to get the registration that was in the glovebox. PFOF ¶ 90. Mensah admits he does not recall if he asked Anderson for the registration. PFOF ¶ 6, 17. That is curious, as Mensah claims he asked Anderson for identification, which Anderson purportedly denied having, but once Anderson was killed, identification was found on Anderson's person. PFOF ¶ 10. As noted previously, the Court should view Mensah's purported statements of what he and Anderson said to each other critically. *Cyrus*, 624 F.3d at 862 (a court must "examine all the evidence to determine whether the officers' story ***is consistent*** with other known facts.")(emphasis added); *Abdullahi*, 423 F.3d at 772 n.7.

Mensah knew and admits that Anderson was permitted to have an openly visible weapon in the car under state law, PFOF ¶¶ 15, 16, 94, so that cannot be a basis to shoot Anderson. Mensah also admits that Anderson had a mobile phone on the front seat and was entitled to reach for the mobile phone (as opposed for the gun), PFOF ¶¶ 22, 24, so that cannot be a basis to shoot Anderson. Even if Mensah initially believed that Anderson may have been reaching for the gun, it is clear from the video that Anderson put his hands back up. And, importantly, when Anderson did put his hands up it negates Mensah's ability to shoot Anderson. *Compare Bliss v. Chu*, 783 F. Supp. 2d 1058, 1065 (E.D. Wis. 2011)(Adelman, J.) ("Thus, as of August 14, 2006, *it was clearly established* that the Fourth Amendment prohibited Chu from shooting Bliss after the danger posed by his actions had passed."), (citing *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003)("It is clearly established that "even '[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.'"))(internal cites omitted).

Finally, there is a major factual dispute as to what took place immediately before Mensah's use of deadly force. Defendants argue that Mensah perceived Anderson was reaching for the weapon, while Plaintiffs alternatively allege that Anderson was fully compliant and was likely reaching for his mobile phone to record the incident. It is unclear whether the immediate danger that Mensah claimed was present at the time he shot Anderson or whether it had passed. The existence of a question of fact over the immediate danger prevents this Court from finding that Mensah is entitled to qualified immunity. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)

If a trier of fact could conclude that at the time that Mensah fired his weapon at Anderson it would have been clear to a reasonable officer that Anderson was surrendering or not a threat, Mensah's decision to shoot at Anderson six times could not be considered reasonable. Because a jury could find Mensah's actions to be unreasonable, it is impossible for this Court to find that Mensah properly exercised deadly force and summary judgment is not appropriate.

## IV. THE COURT MUST DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' MONELL CLAIMS.

Defendants move for summary judgment as to the liability of the City of Wauwatosa under *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d. 611 (1978). Section 1983 applies to municipalities and other local governmental units. *Monell*, 436 U.S. at 690; *Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). Plaintiffs admit that a municipality "cannot be held liable solely because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691; *Kujawski*, 183 F.3d at 737. Municipalities generally are not liable under § 1983 unless the

constitutional violation was caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000); *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). *Monell* liability attaches when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or act may fairly be said to represented official policy, inflicts injury that the government as an entity is responsible for under section 1983." *Monell*, 436 U.S. at 690-94.

Here, Defendants argue that there was no violation of Wauwatosa policy because there is no evidence that the execution of a policy, practice, or custom of Wauwatosa caused the alleged deprivation. That is wrong. First, as previously noted, Defendants did not file their answer to the Amended Complaint, as required, by Fed. R. Civ. P. 12(a)(4)(A), so, they have admitted the allegations of the Amended Complaint. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170 *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021). That means that Defendants have admitted the following facts for purposes of summary judgment: (1) Wauwatosa had a de-facto policy, regulation, decision or custom condoning objectively unreasonable excessive force, failed to have in place officer-involved shooting protocols, especially with regards to psychological assessments, and failed to have adequate discipline and training protocols, which were adopted by Wauwatosa, either expressly or implicitly, by Weber's failure to act. Anderson ECF 47, ¶216-224. (2) Wauwatosa failed to either investigate or discipline Mensah after the first shooting of Antonio Gonzales. Anderson ECF 47, ¶¶ 217-218; And that, (3) Wauwatosa, through Weber, was aware of these deficiencies. Anderson ECF 47, ¶221.

But, even without the admissions for the failure to answer serving as a very reasonable and strong basis to deny summary judgment, Defendants' argument that "the officers followed the policy" is circular when the lack of a policy itself is what is at the very heart of that which creates *Monell* liability. More to the point, Plaintiffs does not assert nor have evidence that Weber and the City *knew* that Mensah was going to shoot and kill Anderson. Instead, it is clear, based on Defendants' own declarations and Weber's deposition testimony that there was no clear policy as to how to handle officers when they ***returned*** to duty after previously killing someone. PFOF ¶¶ 85-86.

There is liability under *Monell* if there is a lack of a policy that led to the constitutional deprivation. *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 379 (7th Cir. 2017)(citing *Monell*, 436 U.S. 690-91). In *Glisson*, the Seventh Circuit noted that "The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation. It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter ***or a hands-off approach***." Glisson*, 849 F.3d at 379 (emphasis added). Indeed, the court noted that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson*, 849 F.3d at 381; *see also King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction.").

Here, a reasonable jury could find Weber and the City's lack of a policy as to fitness for duty when officers return after killing or seriously wounding an individual (i.e. Mensah's killing of Gonzalez) is what contributed or lead to the constitutional deprivation as to Anderson. PFOF ¶ 85, 86, 88.  Weber gave Mensah a commendation for valor on August

22, 2016 because he shot and killed Gonzalez and while he was being investigated for Anderson. PFOF ¶ 70. The commendation was given **before** Mensah purportedly was declared fit for duty and before it was determined if he had violated any criminal and policies with the WPD. PFOF ¶ 69, 85.

Furthermore, Weber admitted that awarding an officer a medal of valor ratifies the conduct of an officer and sends a message that they conducted themselves the way a Wauwatosa police officer should. PFOF ¶ 70. A reasonable jury could find that the fact that Mensah who after seven months of working with the WPD was feted and celebrated by Weber and the City for one killing, justified or not, before Weber and the City both had confirmed that Mensah was cleared for his second shooting less than a year later and verified that he could return to action contributed to Mensah's belief that he was a "super cop" and above the law, that he could not be stopped. PFOF ¶ 73. The motion for summary judgment should be denied.

## V. THE EQUAL PROTECTION CLAIM SURVIVES SUMMARY JUDGMENT BECAUSE DEFENDANTS FAILED TO FILE AN ANSWER TO THE AMENDED COMPLAINT AFTER THEIR MOTION TO DISMISS WAS DENIED.

Although raising the issue again begins to sound like a broken record, it still remains true that Defendants did not file their answer to the Amended Complaint, Anderson ECF 47, as required, Fed. R. Civ. P. 12(a)(4)(A), once the Court issued its ruling on the motion to dismiss. Gonzales ECF 25. Therefore, for purposes of summary judgment, Defendants have admitted the allegations in the Amended Complaint, and summary judgment should be denied. FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

Here, that means that Defendants have admitted the following facts for purposes of summary judgment: (1) Wauwatosa police officers were known to exhibit racist views,

especially as they hosted their MLK parties where at least thirteen officers were present with racist literature. ECF47, ¶ 17, 22-29, 31. (2) Defendant Weber promoted the host of the parties, John Bozievich, while at the same time the whistleblower (about the parties) claimed that Weber caused him problems. Anderson ECF 47, ¶¶ 29-30, 34; (3) In 2018, Wauwatosa's population was reported as only 5.3% Black, yet in 2018, 83% of arrests were of Black people and 64% of traffic stops were of Black people. ECF47, ¶41; (4) In 2015 Antonio Gonzales was killed and in 2020 Alvin Cole was killed, both by Mensah, and he was awarded a medal of valor for both killings. ECF47, ¶68; (5) In September 2, 2019, WPD pulled over a car with two white women and one young black teenager, Akil Carter, who they drew their weapons ordered him to the ground and hand cuffed and arrested him, even though Carter was the grandson of one of the women and did nothing wrong neither of the white women were arrested or detained.ECF47, ¶142; (6) WPD responded to an armed robbery on August 10, 2006 of a man with a red shirt, later a WPD officer tackled a black man who was not the suspect, Aaron Lawrence, who had not committed any crimes, to the ground as well as handcuffing and tasing him several times. ECF47, ¶143; (7) WPD officers, on August 8, 2002, responding to a robbery who they had the description of the suspect, they encountered Alfrieda Durrah, who did not match the description, other than being a black woman, and they drew guns on her, ordered her to the ground, arrested, and even after finding out that she was not the suspect took her to the police station and put her in a jail cell. Anderson ECF 47, ¶144; and (8) In 2016, Wauwatosa was the recipient of state and federal grants of which some monies were used towards its police department. PFOF ¶ 96.

The Equal Protection Clause provides that "no State shall . . . deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. It is

"essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). An Equal Protection Clause violation typically occurs when state action discriminates based on a person's membership in a protected class, such as race, or interferes with a person's fundamental rights, such as freedom of speech or religion. *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009). The Equal Protection Clause also may be violated if state action "irrationally targets an individual for discriminatory treatment as a so-called 'class of one.'" *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). "To maintain an equal protection claim, 'plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.'" *Levan Galleries LLC v. City of Chicago*, 790 F. App'x 834, 835 (7th Cir. 2020) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001)).

Wauwatosa and their policing and excessive force against Anderson was done with a discriminatory purpose and Anderson was discriminated against because he was Black. *Dunnet Bay Const. Co. v. Borggren*, 799 F. 3d 676, 697 (7th Cir. 2015). The facts admitted by Wauwatosa demonstrate that there have been numerous incidences of excessive force and a history of not disciplining its officers for racist behavior against people of color, all under the leadership of Weber. PFOF ¶ 67, 77. Wauwatosa devalues people of color which is reflective in their over policing of Black people and there are no consequences. Anderson ECF 47, ¶45. The continual failure of Wauwatosa to discipline or create policies in the WPD for excessive force as well as its racially biased policing created a culture and custom that emboldened racist policing in Wauwatosa and also emboldened officers like Defendant Mensah to impose excessive force against black males like Jay Anderson, Jr., Antonio Gonzales, and Alvin Cole. Anderson ECF 47, ¶39.

## VI.    THE MINOR J.A.'S LOSS OF SOCIETY AND COMPANIONSHIP CLAIM SURVIVES SUMMARY JUDGMENT AND IS ENTITLED TO GO TO A JURY.

Apparently, this is nothing more than a make-weight argument by the Defendants. First, Defendants concede that J.A. is in fact the biological child to Jay Anderson, Jr. DPFOF (ECF 79) # 3. Next, they admit that the claim itself, a minor child suing under Section 1983 for loss of society and companionship for the death of a parent, is viable, citing *Avery v. City of Milwaukee*, No. 11-C-408, 2015 WL 13016242, *1 (E.D. Wis. May 19, 2015), citing *Russ v. Watts*, 414 F.3d 783,790 (7th Cir. 2005)(Wherein the Seventh Circuit "agree[d] with [its] sister circuits that minor children's need for the guidance and support of their parents warrants 'sharply different constitutional treatment.'"). *See also Mombourquette v. Amundson*, 469 F. Supp. 2d (W.D. Wis. 2007). The only holdup, as Defendants concede, is that there must be an underlying constitutional violation. Defendants claim that Mensah's shooting of Anderson was permissible, and thus there is no violation. Again, Defendants are wrong. First, Defendants never answered the allegations in the Amended Complaint, Anderson ECF 47, and thus the allegations contained therein are admitted,[12] including Paragraphs 209 (the killing of Anderson violated ". . . his constitutional right[s] under the Fourth and Fourteenth Amendments."), 210 (". . . Defendants intentionally inferred [sic] in J.A.'s familial relationship with her father . . . ."), 211 and 212. The "admission" through failure to answer permits a jury trial.

Second, as noted supra., at Section II, there is an actual constitutional violation, as the killing of Anderson by Mensah was done with excessive force, or, at a minimum, it

---

[12] FRCP 8(b)(6); *Modrowski,* 712 F.3d at 1170; *Barwin*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021).

is a disputed issue of material fact as to whether Mensah could use force, and if so, whether the force used was reasonable, such that the disputed issue requires a trial.

Curiously, this Court already has determined that J.A. could bring a state claim for loss of society and companionship under Wis. Stat. § 895.04(4). Anderson ECF 56, at pp. 7-8 ("Because J.A. is Anderson's daughter, she may proceed with her state law claim."). But also curiously, Defendants failed to move for summary judgment as to the state law claim, and instead only chose to move as to the Section 1983 claim. Plaintiffs thus are permitted to move forward to trial on J.A.'s state law claim.

## VII. MENSAH IS LIABLE FOR HIS FAILURE TO RENDER AID TO ANDERSON

Anderson was alive until almost 4:00 AM. Upon killing Anderson Mensah made no effort to provide any medical care to him. PFOF ¶ 97. At 3:07 a.m., Mensah shot at Anderson six times, and it was not until 3:09:41 a.m. that other officers arrived. Cade Decl. ¶ 20 at 3:07 a.m. Mensah was alone with Anderson, in the park for two and a half minutes while Anderson had a pulse. As such, Mensah should be liable for his failure to act in violation of Anderson's constitutional rights under the Fourteenth Amendment. *Acosta v. City of Chicago*, 2018 WL 3630011, *5 (N.D. Ill. July 31, 2018) ("Police officers have a constitutional duty to provide adequate medical care to people in their custody."), citing *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) (quoting *West v. Atkins*, 487 U.S. 42, 55–56 (1988). *See also Estate of Perry v. Wenzel*, 872 F.3d 439, 454-56 (7th Cir. 2017). The Fourth Amendment governs the determination of the objective reasonableness. *Currie*, 728 F.3d at 629. The issue here is the seriousness of the need for medical attention. Clearly, suffering multiple gunshot wounds to the head is serious. *Acosta*, 2018 WL 3630011, *5 (N.D. Ill. July 31, 2018) ("Under the Fourth Amendment, the inquiry into seriousness operates on a sliding scale."), citing *Ortiz v. City of Chi.,* 656

F.3d 523, 531 (7th Cir. 2011). And in cases of delayed medical access, "'the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.' *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (collecting cases analyzing delayed treatment under the Eighth Amendment).

Here, Mensah drove into Madison Park at 03:01 A.M. and engaged with Anderson. At 03:07, Mensah shot at Anderson six times, killing him. At approximately 03:11, Mensah for the first time, after killing Anderson, approaches the vehicle with Officers Mills and Salyers while the vehicle door was open. At 03:11:29, Mensah disengaged from assisting and completely walks out of view from the camera. and still had not checked Anderson's vitals. At 03:11:55 Salyers says over the radio, without anyone checking for Anderson's vitals, that he is not breathing. At 03:12:02 Mensah reappears about 10 feet away from the passenger side and walks away again. Cade Decl., Ex. 9 at Ex. 31 p. 44, 45. Salyers at 3:14:54 acknowledges that Anderson has a pulse. An officer calls out at 3:15:18 "He's got a pulse." *Id,* p. 66 Finally, at 3:15:25 a.m. for the first time and without Mensah's assistance – officers provide medical assistance and Anderson is transported to Froedtert Hospital arriving at 03:46 a.m. **still alive**. *Id* at pg. 8, 64,65. At 04:05 a.m., nearly an hour after Mensah shot him, Anderson is pronounced dead. *Id* at pg. 8. It goes without saying that Mensah recklessly disregarded failing to provide aid to and his failure to render aid was objectively unreasonable.

## CONCLUSION

For the reasons stated herein, Plaintiffs request that this Court **DENY** the Defendants' motion for summary judgment and allow this matter to proceed to trial.

Dated this August 22, 2023.

**CADE LAW GROUP LLC**

By: *s/Nathaniel Cade, Jr.*
Nathaniel Cade, Jr. SBN: 1028115
Antonique C. Williams, SBN: 1051850
Annalisa Pusick SBN: 1116379
P.O. Box 170887
Milwaukee, WI 53217
(414) 255-3802 (phone)
(414) 255-3804 (fax)
nate@cade-law.com
antonique@cade-law.com
annalisa@cade-law.com

**MOTLEY LEGAL SERVICES**

Kimberley Cy. Motley, SBN 1047193
PO Box 1433
Matthews, NC 28106
(704) 763-5413 (phone)
kmotley@motleylegal.com


Attorney for Plaintiffs